from the Southern District of Iowa. Mr. Mayo appeals his conviction for firearms and drug offenses after unsuccessfully moving to suppress evidence that was obtained in his apartment. That evidence was obtained pursuant to a search warrant, which resulted from an investigation that began at a concert in Moline, Illinois, which is just across the river from Davenport, Iowa. And prior to that concert, police were basically sweeping the parking lot. You know we're familiar with the facts. Okay, Your Honor. If that's the case, then getting to the issues at hand, this appeal presents issues that this Court has to consider again after the hard evidence is presented in Jardina's case in the Supreme Court, and consider anew for the first time with respect to the use of I say Jardine's. Is that the one you're talking about? Yes, Your Honor. I've never heard it pronounced with an H, so I was wondering if I was thinking of the right case. No, you are, Your Honor. It's the dog sniff case from the Supreme Court on the porch. And the second issue that this Court is going to be confronting for the first time is the constitutionality of hidden cameras that are being placed in apartment buildings. So the Well, we've had whole camera issues. We have, Your Honor. And I think that You'd have to distinguish those. That's correct. And I think that What happens to this case if, or can this case be analyzed in such a way that the evidence obtained from the fake fire alarm camera is excluded? Is there enough other evidence in this case to support the issuance of a warrant? Your Honor, that's Or the application of good faith? Your Honor, those are the two main arguments that the government presses here and also presses below. And as I noted in my brief, fully one-third of the paragraphs that are contained in the search warrant application for Mr. Mayo's apartment contain evidence that's related to those cameras. So this isn't a de minimis fact that They have a firearm. They do. They have his fingerprints on, I guess, a cartridge for the firearm or some aspect of the firearm. That's correct. They know where he lives. They have the correct address. They have the statements or potential use of the statements related to his instructions to someone about the apartment or where he lived, his crib. Could there be enough other evidence excluding the observations referred to in the record of the camera device? Your Honor, the Fourth Amendment requires particularity. And in this particular case, they were searching an apartment. And all of the illegal activity that was observed that could potentially involve Mr. Mayo occurred outside of the apartment. So the only things that are tying Mr. Mayo to the apartment and to illegal activity that may be occurring within it. That's not a particularity issue, is it? It may be a nexus issue. And what's not particular about this warrant? Well, the search warrant has to draw some connection between the place to be searched and the things to be seized. And in this particular situation, what the government is relying on are two things that are in the search warrant. The defendant's statement when he was in the back of the vehicle, speaking on the phone that was recorded by the body cam, that when you get to the crib, bro, you've got to get all that shit out of the crib. Man, there is shit everywhere. And the second is observations of the defendant coming and going to the apartment complex. But the only actual fact that's contained in the search warrant affidavit that may tie Mr. Mayo to illegal activity inside of his apartment building is that ambiguous statement about getting rid of things in his crib. But what, or in the crib, rather, and that's an important distinction, is he doesn't That's a much tougher case for if it said, if he knew it was his crib. That's correct. And what's also important in this case is there were multiple apartments that were being surveilled by police. Why wouldn't it be logical to assume he was referring to his crib? Would it be logical to assume? It could be logical to assume. Why isn't that enough? Because it doesn't necessarily allow a judge to make an inference that there are illegal things in that apartment. It doesn't allow a judge to make an inference despite the fact that it's logical? Where are we? We're on a different page than the warrant cases I've dealt with. Well, it's true that a judge has to make a common sense determination as to the probability of illegal things being found in the place to be searched and that it isn't a hyper-technical evaluation that he's making. But the simple statement of when you get to the crib, you've got to get all that shit out of the crib, that doesn't necessarily No, but it links to the other part. I mean, it certainly does in the government's view. It links to other things other than the excluded camera. It certainly does in the government view. But here's what my answer to that question would be. Is there enough? What's your best case? If there is enough. What's your best case on this nexus argument? Well, I haven't approached the nexus issue. What I'm talking about You call it particularity. I think that's wrong. What's your best case for this? You can't, even though it's logical, the judge can't draw that inference. Well, my best case is that if the information that was contained in the search warrant was sufficient, then why did police go to all this trouble to install two hidden cameras and load the search warrant application? That's not relevant to the analysis of whether, of excluded. In the exclusion case, don't, obviously they put it in there. The government puts in everything it thinks might be of significance. It's honest. Well, Your Honor, I think that the What's your best case on these facts? Your Honor, I think that the best case that I have on these facts is the Seventh Circuit case in Whitaker, which I have discussed thoroughly in our brief. Now, Whitaker is different because it involves the use of a canine's search dog, but the other facts surrounding the case, the multi-unit apartment complex, the dealing with the good faith issue, those things are very, very similar to this case. And what's really important as well is that the Seventh Circuit took the same view as the Eighth Circuit did prior to Hardina's being decided by the United States Supreme Court, and that was that the defendant did not have an expectation of privacy in the common entryway of his apartment dwelling. But the Seventh Circuit acknowledged that while that may be true, that he doesn't have the same expectation of privacy as somebody, for instance, in a single-family home, he still had an expectation of privacy that there wouldn't be I don't suggest that Whitaker was the basic question of the use of the camera. I was asking you about the case law, about whether if this evidence must be excluded from the affidavit, was there enough left for the issuing magistrate to find a probable cause and officers executing the warrant to rely on it in good faith? Whitaker doesn't address that, does it? It does address the issue of good faith. It talks about how There's a distinction between whether evidence must be excluded from the warrant for one reason or another, and then you go to the question of whether what's left in the warrant affidavit was enough for probable cause, and that's what I was focusing on. And you concede that the Cribb comment, it would be logical to infer from that and the other things that are in the warrant that are not excluded, that he was talking about his apartment. Well, I think that that's Isn't that enough? If it's logical, doesn't the case law Your Honor, I would respectfully disagree that I conceded that. I think that that's the government's position. Okay. I mean, I think you had to. It's valid, but I guess I didn't study how you briefed this well enough. Well, counsel, as I understand your Fourth Amendment argument, you focus on the presence of the camera and it being an intrusion of privacy in violation of a person's reasonable expectation. Do you have a case that's analogous to this, because the cases like the Florida case from the Supreme Court involve the dog sniff at the door of an apartment, but a camera that is essentially like the presence of an individual able to see only, it's not detecting emanations, it's not looking through the walls, it's just there as if a person was standing. Do you have a case like that that would indicate that the presence of the camera alone constitutes an infringement? Your Honor, I don't have a case like that, and I think that as technology develops, we're going to have these law enforcement tools that the case law hasn't come up with. How is it different, say, from the drone case, where it's okay to have a drone go over your backyard as opposed to having infrared imaging of heat sources? Well, I think that the difference between those cases is that that's a momentary intrusion, whereas this is continuous surveillance. And, in fact, that's what the Supreme Court was concerned about in the Jones GPS case. Could the police have put somebody in the hallway and just put them in a chair and have them sit there? The police could certainly do that, but that's not going to be as effective as having a hidden camera, because if a police officer is sitting there, that's obviously going to deter illegal conduct that they're trying to observe. Obviously, if they were uniformed, but if you just had somebody just sitting there in normal clothes, watching who comes in and out of the doors and on that floor, would that be a violation? Well, the human body, as I discussed with police dogs, has limitations. It can't sit there 24-7. It's going to have to move, go to the bathroom, eat, sleep, et cetera. What makes these cameras particularly pernicious from a Fourth Amendment standpoint is that they are not only concealed, but they're always on. Can the police use someone else's camera? For instance, if the landlord had such a camera that was there, could they get the footage to view? Security cameras are continuous and ubiquitous. They are, but they aren't used as a police instrument. They are used by private parties. What they capture is used as evidence by law enforcement all the time. I see that my time is up. I'd like to reserve my remaining time. My question is about when I ask for the best case. I'm looking at pages 20 and 21 of your brief, which address this issue and cite, without discussing the facts, two Eighth Circuit cases from 1991 and 2004, and then makes the point, noticeably absent from the list of facts in the affidavit, are any facts that tie illegal activity to Mayo's home. And that's what I meant by the best case. You cite two old-timers from the Eighth Circuit. And so is one of them factually on point? Or if not, have you found any other case from anywhere that is? Well, Your Honor, the Hernandez-Leon case and the Templeman case are cited just for the basic rule statement. That's why I asked the question. Best case on the facts. I have not cited in my brief any case that I guess is my best case on that issue. You know, we're here looking for help. If I'm going to take this, and I'll probably read those two cases and see they were factually very dissimilar, and now I have to go do the work that I assume you did in briefing the case, so I'm looking for your help. Your Honor, I think that such a case would not really be of very much assistance because it's so factually dependent case by case. You're going to be looking at a particular warrant. The proposition that the government urges is that that crib call is almost by itself sufficient to tie this all to what's in the apartment. And so there are a lot of cases that I've had some, and I didn't go back and read them all, about what when you're looking at the other stuff in the affidavit and trying to decide if the warrant is therefore invalid. Yeah, you have to get down and dirty, so to speak. You've got to get to the facts. And so you've got to read a lot of cases to even see if it's ever come up before. And that's what I hope the lawyers at Oral Argument will help me with. I see my time is up. Thank you. Your time has expired, but we've inquired of you extensively. We'll give you a minute of rebuttal after hearing the other side.  So prepare yourself for that. Mr. Ripley. Thank you, Your Honor. Good morning. Will Ripley here on behalf of the government. May it please the Court. The district court here was correct to deny Mr. Mayo's motion to suppress. The entry that law enforcement made into that hallway of that building was not into any curtilage, and it was not using any tool that would pull information from inside Mr. Mayo's residence. And in that sense, not only was it not illegal, but it differs greatly from many of the cases. Well, whether the common hallway in an apartment building is curtilage or what part of it is, is an open issue that we've started to address but haven't really addressed thoroughly. It is an open issue, and it's gotten quite a bit of attention, of course, as the Court knows, in the last few years. Well, don't, you know, don't. You just flat out said there was no entry into the curtilage, and that's debatable at least. I'll rephrase it this way, Your Honor. The placement of the tool was not in Mr. Mayo's curtilage. It was on a wall opposite from, in the first instance, opposite from his unit. In the second instance, it was on a wall that was part of the landing between Mr. Mayo's floor, which was the lowest floor, and then the next highest floor. Counsel, don't you think it would be a little disturbing for many Americans to find that the, that law enforcement can observe, put cameras near their private residences and observe their comings and goings 24 hours a day? It depends, I think, a bit, Your Honor, on that which the camera is, at which it's aimed. We have, Your Honor referenced earlier in inquiring Mr. Neiman, the drone case. We have plenty of cases discussing pole cameras, which are also cameras placed in a way so as not to be detected that show a certain area. And sometimes that area is the curtilage of a stand-alone family home. And this is akin to that. The space is tighter, indeed. We have a multi-unit apartment building here, common hallways, four units per floor, very similar to the apartments that this Court considered curtilage in, in Perez and in the Hines case. But cameras are ubiquitous, as surveillance cameras anyway, as Judge Loken indicated. And so I understand the Court's inquiry along the lines of a balance here, but I don't know that it would be entirely surprising to citizenry that law enforcement utilizes this type of camera. The one other thing I want to argue . . . Is there a case anywhere that has approved the use of a camera in this manner as you speak here? In this manner, if Your Honor means in a multi-unit . . . as something that's observing them, but this masqueraded as a fire alarm. Nothing as factually right on point as this, which is obviously a fake fire suppression or fire alarm device that was in fact a camera. However, pole cameras, of course, are placed in amongst other equipment on that pole so as not to be seen. The nature of it doesn't require an overt masking of it as some other device, but it is hidden in the same way. And pole cameras, of course, are used regularly and have not been found to be illegal, even those that do capture portions of a resident's curtilage. And, of course, a camera differs from the tool, for example, that was used in Kylo and the tools that are used in the canine cases. The tool, of course, being the canine nose. This camera is not pulling information from inside the residence that would otherwise be impossible for a human being to do. This tool is simply recording that which the human being could record. For example, Judge Smith, as if they were sitting on a chair in the hallway. It's the same exact information. Any of the evidence that issue pictures that the camera on the opposing wall took while the door was open? It did capture moments with the door being open, Mr. Mayo's. Which means the inside of the apartment. Yes. Briefly, during obviously whatever duration that door was open. Mr. Mayo's apartment. The government proposed, that's in the evidence at issue in the suppression hearing? Yes. There's Governments Exhibits 1 and 2, Your Honor. One is the first view. You'll recall that the camera was removed and then placed in a different location. Governments Exhibit 1 at the suppression hearing does, in fact, show a moment when that door is open and you can see that the apartment essentially you walk in two or three feet. There's nothing to the left. There's no room to go any farther forward to access any of the living portion of the apartment. You have to go off to the right and that is not seen at all. It's just kind of like a slight little entry there. The second placement of the camera was the one that was on the landing. The government could have elected not to offer that. At the hearing? Well, usually a suppression motion is aimed at what the government is proposing to use as evidence. If the government says we're not going to use that, then the issue, it's a non-issue typically, not always. In this case, Your Honor, I wanted to fully inform the district court and this still frame from the camera. You were looking for an order that allowed you to show the picture with the door open and part of the inside revealed. I was looking to just inform the district court of the location of the camera. What's the effect of the position you were taking? I'm sorry? Exhibits 1 and 2 were at issue, right? The government can always say in response, I think, to a motion to suppress, I'm not going to use that. Oh, yes. But you didn't do that here. No, but... So the film, the shots at issue include something inside the apartment. Yes. That's in response to your assertion, no information was pulled from the apartment. The tool is not... This fact compromises your assertion. I understand. You're right in that sense. But I submit that the tool remains different in its nature in still important ways from, for example, a canine nose. Well, except a lot of these Jardines cases turn on how intrusive is it? Indeed. Just the common hallway is different than a peek inside the door. You are correct, Your Honor. Counsel, would you address the... And I think it's a legitimate concern that the affidavit references the camera's record, not as a digital or film record of occurrences in the hallway, but seems to almost describe it as if law enforcement was there in person. It describes it as surveillance in a way that's... One could very easily have that impression and have no clue that a camera was placed there. I understand because there are also examples, portions of the affidavit in support of the search warrant that describe actual human officer surveillance. And those read very similarly, I agree with you, Your Honor, to images gleaned from the cameras. The solution there is... Was the magistrate aware that this was camera footage versus police officer observation or informant observation? Yes, but what I do not believe... The magistrate was aware that it was gleaned from cameras, not necessarily the full nature of it. In other words, a camera affixed to the wall in a semi-permanent location that was disguised to look like a fire alarm. I don't believe that necessarily was in front of the magistrate. But again, here in the government's position, this was addressed a little bit earlier with Mr. Nieman, is that even when we remove any of the information that came from these cameras, from the affidavit in support of the search warrant, we are left with more than sufficient facts to create a fair probability that evidence will be found in the apartment. Obviously, we have the whole situation with the vehicle, what was found in it, two stolen Glock pistols. On one of the magazines of one of those pistols, Mr. Mayo's fingerprint was found. He, of course, is connected with the vehicle, both from the standpoint of him approaching and inquiring about it after it was towed. But then approximately a month later, he's observed in that same vehicle at this apartment unit. He's connected to the apartment through the utilities. And I push back very much on the notion that that phone call is of little import. I think the Court can understand the logic here. It doesn't make any sense for the crib that Mr. Mayo referenced in that phone call to be any residence other than his own. He's the only person in the car. He could be the crib of the other person. The other person that was involved here in somewhat the focus of the investigation, Your Honor, it could, but Mr. Mayo was the only person in the back of the car. And there would be no reason for him to think that law enforcement was imminently going to be approaching anyone's residence other than his own. In other words, law enforcement was focused on him in that moment. He's in the car. He knows he's given a false name. He knows that they, law enforcement, had figured out who he was. The only logical inference is then that the next step or steps would involve undertaking to investigate his residence. It could only be his residence. But even if there are other possible residences, as Your Honor just suggested, the threshold here for the magistrate is to use common sense and reach a fair conclusion based on that. And this certainly is that. And so, again, probable cause to support this search warrant exists, even if we remove all of the information from the cameras. As Mr. Nieman pointed out earlier, that fully one-third of the paragraphs in this affidavit involve these cameras. But, of course, we don't just count paragraphs here. We take them out, whether it's one problematic paragraph or fully one-third problematic paragraphs. And after taking them out, assess whether there is probable cause. And here there clearly is. Lastly, as I briefed, even if the court would disagree on that assertion that there's probable cause remaining even after removal of these paragraphs, the Leon Goodfaith doctrine here supports not suppressing the evidence here. It's just simply none of the factors show that law enforcement was exercising anything other than good faith in the line. Does it detract from good faith that it wasn't disclosed that the observations were electronic versus law enforcement in person? I understand the court's question. Again, the magistrate was aware of the nature of it in that it was recorded rather than live human observation. Beyond that, I do not believe that the full scope of the nature of the camera was disclosed. It doesn't undercut good faith beyond the point of good faith still being applicable. And that is largely due to, again, even within the good faith analysis, you think about what the officer knew at that time. Even if we exclude all the knowledge about the ins and outs of Mr. Mayo and that apartment, the officer knew Mr. Mayo's fingerprints were on guns, that he was tied to this apartment, that he was concerned about what was in the apartment. So concerned, in fact, that he was pretty emphatically telling people on the phone to get into his apartment and get rid of things. And so, no, I don't think it undercuts a good faith analysis beyond the point of good faith still being applicable, Your Honor. Thank you. Thank you, Mr. Ripley. Mr. Nieman. Thank you, Your Honor. When Jones was decided, it was a major Fourth Amendment case, and the Supreme Court was just beginning to grapple with these issues of technology, which at the time were somewhat surprising but have become much more commonplace now. And the government essentially made the same argument in Jones as it did here. Jones, I discussed on page 14 of my brief. They argued that the GPS that was affixed to the chassis of the car is the same as if somebody had been, a police officer had been following the person around. They could have surveilled the person in the car just like the GPS. But the thing that the court said that makes it different is that it's covert, it's continuous, and it's not acceptable to the general public. And the cameras in this case are covert, they're continuous, and they're not acceptable to the general public. What do you mean by acceptable? I'm sorry, accessible to the general public. So this isn't a ring camera where it's obvious that on your front door that if you step in front of this ring camera, then you could be recorded. This was made to look like a fire alarm. And those are not devices that you can go pick up at Best Buy. That is something that is a law enforcement tool that is not in general use by the public. So the police knew that they were using something that was unusual. They were using an unusual method of surveillance that was similar to a type of surveillance that the Supreme Court had already condemned in Jones years earlier. And the government had indicated that the magistrate was aware that these observations were by camera. But the issue is whether the search warrant states that, and the four corners of the search warrant do not contain any information about a camera. And the government doesn't cite anywhere in the record where the magistrate was informed that what the observations were, were coming from a camera as opposed to a human being. Thank you, Mr. Naaman. Thank you.